# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| SCOTT A. ELLIOT, et al., | ) | |
| | ) | |
| Plaintiffs/Counter-Defendants, | ) | No. 13 C 7770 |
| | ) | |
| v. | ) | |
| | ) | |
| MISSION TRUST SERVICES, LLC, | ) | Magistrate Judge Jeffrey Cole |
| CHRISTOPHER C. FINLAY, THE | ) | |
| CORPORATION TRUST COMPANY, | ) | |
| and MICHAEL T. HOSMER, | ) | |
| | ) | |
| Defendants/Counter-Plaintiffs. | ) | |

## MEMORANDUM OPINION AND ORDER

The Mission Trust Investors, now the counter-defendants in this case, have filed a motion for leave to amend the pleadings by filing *instanter* their answer and affirmative defenses to the Mission Trustees' counterclaim. [Dkt. #195]. While that filing is late – it was due no later than December 30, 2014 – given the backdrop of the case, sound discretion – and an exercise of discretion is what is involved, *Pioneer Inv. Servs. Co. v. Brunswick Associates Ltd. P'ship*, 507 U.S. 380, 383 (1993) – warrants a finding that their motion be granted and they be allowed to file their answer *instanter*.[1]

---

[1] If the Investors' motion were to be *denied*, it would put them in default, thus requiring – or so it would seem -- a report and recommendation, 28 U.S.C. 636 (b)(1)(B), with *de novo* review by the district court in the event of timely filed objections. *Id*.; Fed.R.Civ.P. 72(b). *See Evans v. Professional Transp., Inc.*, 2014 WL 1908808, 1 (E.D.Tenn..2014), instead of the "the clearly erroneous or contrary to law" standard under which nondispositive rulings are reviewed. Fed.R.Civ.P 72(a). The "clearly erroneous" standard requires the district court to affirm the decision of the magistrate judge unless "on the entire evidence [the court] is left with a definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395 (1948).

*Granting* the motion does not terminate a claim or defense and thus is a non-dispostive matter that
(continued...)

The course this case has taken thus far has been discussed at length in my order of March 11, 2015 [Dkt. # 190] and, to a lesser extent, in my order of April 7, 2015, in Case No. 14-9625. [Dkt. # 49]. *See Elliot v. Mission Trust Services, LLC*, _F.Supp.3d_, 2015 WL 1138265 (N.D.Ill. 2015); *Elliot v. Mission Trust Services, LLC*, 2015 WL 1567901 (N.D.Ill. 2015). The Mission Trustees never objected to the March 11 Order, and so they cannot be heard to quarrel with the accuracy of that account of their actions. And those actions form at least part of the basis for the resolution of the instant motion.

This case began as a simple one. The Investors filed a one-count declaratory judgment/injunction action in the Eastern District of Virginia seeking to force the Trustees to comply with the terms of the trust agreement. That agreement covered a North Carolina investment property that was teetering on the edge of foreclosure after defaulting on a $19 million loan. Under the agreement, if the trust defaulted or were in danger of defaulting on the loan, the Trustees were obliged to convert the trust to a Delaware limited liability company. The form of the converted enterprise was set forth in an exhibit to the agreement. [Dkt. #126, at 2-3].

With the loan in imminent danger of default, the Trustees sent the Investors a capital call seeking additional funds and indicating that they wanted to convert the trust into a different form of limited liability company that was not in conformity with the agreement. When the Trustees refused

---

[1](...continued)
a magistrate judge can "hear and determine" under 28 U.S.C. 636(b)(1)(A). *Cf., Hall v. Norfolk Southern Ry.,* Co. 469 F.3d 590, 595 (7th Cir.2006)("The district judge correctly held that the magistrate judge's denial of Hall's motion to amend his complaint was nondispositive"); *Tucker v. U.S. Dept. of Army* 1995 WL 337670, 2 (5th Cir.1995). See generally, Jeffrey Cole, Practicing Before United States Magistrate Judges, in Federal Civil Practice, Chapter 10 (Illinois Institute for Continuing Education (2015)).

to follow the terms of the agreement, the Investors filed suit. Shortly thereafter, they filed a motion for summary judgment. The issues were cut and dried; Judge Norgle granted their motion and entered judgment on September 20, 2014. [Dkt. #126, at 2-3].

The flies in the ointment were the Trustees. While the Investors' motion for summary judgment was pending, they allowed the property to go into foreclosure and cancelled the trust agreement. They didn't bother to inform Judge Norgle of this, however, despite that fact that it happened about seven months before he ruled. Instead, they filed a counterclaim, and, once Judge Norgle ruled, a motion for "reconsideration." That motion revealed for the first time what they had done regarding the Trust. In the wake of that filing, the Investors filed a motion to dismiss the counterclaim given the fact that, with the trust cancelled, the trustee had no standing to pursue those claims. [Dkt. #134]. With the trust cancelled and the investors' claims thus rendered moot, Judge Norgle had no choice but to grant the Trustees' "motion for reconsideration." He also apparently denied the Investors' motion to dismiss the the Trustees' counterclaim based on lack of standing because he stated that the counterclaim remained before the court. [Dkt. #145].

In essence, those counterclaims take the Investors' to task for taking steps to protect their investment. When the Trustees sent out the capital call, it notified the Investors that their investment was in jeopardy. Unless the trust were converted to the limited liability company set forth in the agreement, no further funds could be funneled into it. [Dkt. #1, ¶ 13]. And so, the Investors demanded that the Trustees follow the terms of the agreement and convert the trust accordingly. [Dkt. #55, ¶ 14]. But the Trustees had other ideas, as already noted, and wanted to convert the trust into a different form of limited liability company. Under the trust agreement, under the terms of the new limited liability company, the Investors could remove the manager of the trust upon a 75% vote.

3

Under the terms the Trustees proposed, the manager could only be removed upon a final adjudication of gross negligence, willful misconduct, or fraud. [Dkt. # 1, ¶ 28].

The Trustees also conditioned conversion of the trust upon complete releases of liability from the Investors. [Dkt. # 1, ¶ 28]. After what the Investors deemed mismanagement of the investment property, *see* [Dkt. #1, ¶ 27 (beneficiaries of the trust who visited the property after the capital call "document deterioration, significant deferred maintenance, and safety concerns, including the following: an unsightly dump site visible from the main road of the premises which included old mattresses, derelict furniture, and refuse; stagnant detention ponds filled and covered with algae due to broken aeration pumps; facade work, including wood rot and peeling paint; needed roof and gutter repairs; dead trees; visible mold; and exposed electrical wiring. . . .")], the Investors were understandably reluctant to give the manager even more unchecked power along with more of their funds.

One of the provisions of the trust agreement allowed the lender to demand the conversion of the trust to the form of limited liability company specified under the agreement. [Dkt. #1, ¶ 32; Dkt. # 55, ¶ 15]. And so, with the Trustees being recalcitrant (and time, no doubt, of the essence) the Investors, through their attorney, contacted the lender by letter and requested it to take action. [Dkt. # 55, ¶ 15]. About a month after that, on August 21, 2013, the Investors filed their declaratory judgment/injunction suit against the Trustees. A second letter in October 2013 informed the lender that the Investors needed the lender's cooperation in order to convert the trust and infuse it with new capital. [Dkt. # 55, ¶ 16].

The Trustees' claim that these letters included many misrepresentations as to the conduct of the Trustees with regard to the property. [Dkt. # 55, ¶ 17]. Those misrepresentations, according to

4

the Trustees, were that the property had been run into the ground, that vendors' accounts were seriously in arrears, and that the master tenant and the trust property were in default. [Dkt. # 55, ¶¶ 17, 34-36]. Other than that, for the most part, the documents do little more than indicate that over 75% of the Investors demand the conversion the Trustees were obligated to make under the terms of the trust agreement. The point is also made that the Trustees' capital call, which demanded $1.9 million from 50 investors in just three days time, was rather onerous – not exactly a controversial characterization. [Dkt. # 55, Ex. D].

The upshot of the counterclaim is that the Investors lay the blame for the default at the feet of the Trustees. They claim their demands for the conversion of the trust – which, of course, was guaranteed to them by the trust agreement – muddied the waters in the Trustees negotiations with the lender and scotched any deal they might have reached. [Dkt. # 55, ¶ 25]. The Trustees' counterclaim charges the Investors with breach of contract, negligence, defamation, and tortious interference. The defamation count is based on the purported misrepresentations regarding property condition, vendor accounts, and default of the master tenant and trust property. [Dkt. # 55, ¶¶ 33-38].

The remaining claims are based on four provisions in the trust agreement stating that: (1) "no Investor shall have any authority, other than as specifically provided herein, to act on behalf of any other Investor or to impose any obligation with respect to the Trust Property" [Dkt. #55, Ex. A, §5.01]; (2) the provision requiring the Trustees to convert the trust if the trust defaulted the loan or if default was imminent, or if directed to do so by the lender (the very provision Judge Norgle found the Trustees to have violated) [Dkt. #55, Ex. A, §9.02]; and (3) a provision detailing distribution

5

of the trust assets upon termination of the trust [Dkt. #55, Ex. A, §9.03].[2] The Trustees claim that these provisions somehow prohibit the Investors from having any contact with the lender. [Dkt. # 55, ¶¶ 20, 27, 31]. That's not readily apparent from any of the cited provisions, but those are the Trustees' allegations, which Judge Norgle allowed to stand in a minute order issued September 30, 2014. [Dkt. #124].

The Investors' proposed answer to the counterclaim – again, coming several months late – denies many of the Trustees' allegations and advances several "defenses": failure to state a claim[3]; failure to join necessary parties; lack of standing; unclean hands; failure to allege sufficient facts to give rise to punitive damages; and, as to the claim for defamation, the alleged defamatory statements were substantially true, or they were opinion, or privileged, or not directed at the Trustees, or are capable of an innocent construction. [Dkt. #195-1]. The Trustees say that the Investors must not be allowed to file their tardy answer because: (1) it will severely prejudice the Trustees and they will have to do a substantial amount of discovery; (2) the five-month delay substantially impacts these proceedings; (3) the Investors' failure to timely file was due to nothing but their own neglect; and (4) the Investors have not acted in good faith. [Dkt. # 197, at 7]. Both parties agree that these are

---

[2] The Trustees also refer to a provision in the deed of trust which they claim is attached to their counterclaim as Exhibit D [Dkt. # 55, ¶ 23], but Exhibit D is the letter from the Investors to the lender and their attached affidavits. [Dkt. # 55, Ex. D].

[3] Technically, failure to state a claim is not a defense, although often erroneously pleaded as such as a matter of course. *Imperial Construction Management Corp. v. Laborers' International Union*, 818 F.Supp. 1179, 1186 (N.D. Ill. 1993). Such a "defense" attacks a plaintiff's prima facie claim, and is thus a "negative defense," rather than an affirmative defense, which must plead "matter that is not within the claimant's prima facie case." 2A Moore's Federal Practice ¶ 8.27[1] (2d Ed. 1992). *See also Fort Howard Paper Co. v. Standard Havens, Inc*., 901 F.2d 1373, 1377 (7th Cir. 1990) (affirmative defenses do not controvert proof of the claim to which they are addressed). Thus, a "failure to state a claim" defense should be raised by motion rather than in an answer, and should be stricken when it is not. *Instituto Nacional, supra*, 576 F.Supp. at 991; *Donovan v. Robbins*, 99 F.R.D. 593, 597 (N.D. Ill. 1983)(Will, J.), *rev'd on other grounds*, 752 F.2d 1170 (7th Cir. 1984).

the factors to look at here, pointing to *Pioneer Inv. Servs. Co.v. Brunswick Associates Ltd. P'ship*, 507 U.S. 380, 383 (1993).

We will address this last point first. This is the third or fourth filing by the Trustees in which they accuse the Investors of "gamesmanship." They have become a jukebox with one record. Want a default judgment? Shout "gamesmanship!" How about subpoenaing a third party in Texas and dragging him here to defend against that subpoena? (rather than agreeing to a reasonable continuance to take a deposition). Again, "gamesmanship!" But as has been revealed, the gamesmanship meter points not so much to the Investors but rigidly toward the Trustees. They have already been found, beyond any material issue of fact, to have violated the trust agreement and shirked their obligations to the Investors. They ought to have lost the case already. But, when, given the Trustees' recalcitrance, the Investors sought to protect their investment through self-help, the Trustees filed a "how-dare-you" counterclaim. While Judge Norgle was mulling the Investors' ultimately successful motion for summary judgment, the Trustees cancelled the trust. They didn't inform Judge Norgle until nearly eight months after the fact. All this, as already noted, has been discussed in *Elliot*, _F.Supp.3d_, 2015 WL 1138265[Dkt. # 190] and *Elliot*, 2015 WL 1567901. [No. 14-9625, Dkt. # 49].

As already noted, the Trustees have waived any objection they might have had to the findings in the order on their motion for sanctions in this case [Dkt. # 190], but they have objected to my order quashing their subpoena to the third party in Texas. And, in those objections, they continue along the same lines. But rather than hide salient facts from Judge Norgle as has been their wont, they misrepresent the record. For example, the Trustees assert that my order quashing the subpoena "ignores the Texas court's opinion that the resolution of the Quash Motion would be preferable in

7

this Court." [No. 14-9625, Dkt. #53, at 10]. In reality, the Texas court's opinion is discussed at length in my order. [No. 14-9625, Dkt. #49, at 3-4].

The Trustees complain that, although my order mentioned an internet search, according to them, an internet search does not reveal the subpoenaed party's address. [No. 14-9625, Dkt. #53, at 11]. But, as is clear from the order, the issue was whether the Trustees made any effort to comply with the rules. They had to show they made a reasonable effort, but in their filing defending their subpoena, they failed to describe any effort whatsoever they might have made to locate the party. As the order clearly stated, "[w]e have nothing from the [Trustees] to show they made any such attempt, not even the minimal effort of conducting an internet search." [No. 14-9625, Dkt. #49, at 8]. An internet search was mentioned as the least amount of effort one might go through to locate a party. The Trustees made no mention of any attempt they might have made. [14-9265, Dkt. # 13, at 8]. Perhaps the Trustees made valiant efforts to locate the third party but, much like their cancellation of the trust, they chose not to reveal them to the court and ought to be left with the consequences.

The Trustees further complain that the letter from which the order draws some of the history of the third party's offer of alternate dates for deposition and document production was written after the motion to quash was filed. [14-9265, Dkt. # 13, at 8]. So what? The letter recounted a history of negotiations between the parties, so the date it was written was of no moment. The Trustees continue along these lines, and whether you term their tactics mischaracterization, misrepresentation, obfuscation, or something else, the point is that, if anyone should be charging anyone with "gamesmanship" or bad faith, it ought not to be the glass-house-dwelling Trustees. Among the four factors set forth in *Pioneer Inv. Servs.*, "bad faith" certainly cannot be found to go against the

8

Investors.

Turning to the remaining factors, the Trustees complain that they will suffer "extreme prejudice" if the Investors are allowed to answer their counterclaim. They claim that they will have to redepose 5 witnesses regarding "new allegations and defenses never before disclosed." The allegations in the Investors' answer aren't really "new", they are more a rehash of the allegations of their complaint. It's their account of what happened to them and how they tried to get around the Trustees' refusal to comply with the terms of the trust agreement. [Dkt. #195-1, at 13-17].[4] As for the defenses, at bottom, the Trustees' counterclaim is about whether the trust agreement forbade the Investors from contacting the lender and whether what they said to the lender about the condition of the property, the vendors' accounts, and the default were true. As such, the defenses asserted ought not have been surprising and, it would seem, these issues would have been addressed in discovery in any event.

Moreover, the depositions the Trustees complain about having taken already were all taken before the Investors' answer to the counterclaim was due. Judge Norgle did not finally resolve the matters of the motion for reconsideration, and the Trustees' standing to bring the counterclaim at all, until December 16, 2014. As such, the answer was then due 14 days later, or December 30, 2014. Fed.R. Civ.P. 12(a)(4). The dates of the depositions the Trustees are concerned about were October 20, 2014, November 4, 2014, and December 18, 2014. [Dkt. # 197, at 8]. All before the answer was even due, so, even if the "new" allegations and defenses were raised on time, it would not have mattered for depositions that had already taken place.

---

[4] Of course, the Trustees point to no specific allegations in the answer that they deem new or surprising. [Dkt. #197, at 8-9].

The Trustees also complain that, should they have to take new discovery – which they would have to show a need for and do a better job than they have in their response brief – time is short because discovery is set to close June 29, 2015. But no trial has been set and, as just mentioned, if they can make a decent showing, they can easily be accommodated. And, given the Investors' tardiness, it should go without saying that their cooperation would be expected. Moreover, the lateness of the Investors' answer could not have been so impactful to the Trustees because they didn't even notice it until the Investors filed their instant motion. That's clear because, about a week after the December 30, 2014 deadline for the Investors' answer, the Trustees filed a sanctions motion seeking a default judgment and made no mention of the Investors' failure to meet that deadline. [Dkt. # 152].

Finally, the Trustees contend that the Investors cannot establish excusable neglect for having missed the deadline by so much. Under *Pioneer,* "[t]he test as to what constitutes excusable neglect is an 'equitable one,' taking account of 'all relevant circumstances surrounding the party's omission.'" 507 U.S. at 395. We have already looked at most of the factors to be balanced in making this equitable determination and found the scales tilt in favor of allowing the Investors to answer the complaint. The remaining factor – the reason for the delay, including whether it was within the reasonable control of the movant, *Pioneer,* 507 U.S. at 395 – also tend to favor allowing the late answer, especially when considering the totality of the circumstances as we are instructed to do by the Supreme Court.

This case had and still has a very unusual posture owing to nothing other than the actions of the Trustees. That they refused to follow the terms of the trust agreement that controlled their action gave rise to this case. The case ought to have concluded simply when Judge Norgle found that had

breached their obligations under the agreement. But the Trustees went behind the backs of Judge Norgle and the Investors and upended the proceedings. This singular set of events made it difficult for all involved to determine the next step. And, while this was going on, the Investors were changing counsel, not once but twice. Yes, as the Trustees submit, parties are accountable for the acts of their counsel. *Pioneer*, 507 U.S. at 396-97. But, from a global perspective, the shuffling of counsel does not tip the scales of equity against the Investors. A finding of "excusable neglect 'is not limited to situations where the failure to timely file is due to circumstances beyond the control of the filer,' but extends to some cases in which the delay is 'caused by inadvertence, mistake, or carelessness.'" *Lewis v. School Dist. #70*, 523 F.3d 730, 740 (7th Cir. 2008)(quoting *Pioneer,* 507 U.S. at 391). Parsing the inexcusable from the excusable is a matter of discretion. *In re Canopy Financial, Inc*., 708 F.3d 934, 936 (7th Cir. 2013).

As noted in *Elliot,* 2015 WL 1567901, 3, discretion denotes the absence of a hard and fast rule. It requires that a court act "with regard to what is right and equitable under the circumstances and the law, and directed by the reason and conscience of the judge to a just result." "'Abuse of discretion' means something more than [a reviewing court's] belief that [it] would have acted differently if placed in the circumstance confronting the district judge." *Anderson v. United Parcel Serv*., 915 F.2d 313, 315 (7th Cir.1990). "The district court's decision must strike [the court] as fundamentally wrong for an abuse of discretion to occur." *Id*. *See also Chavez v. Illinois State Police,* 251 F.3d 612, 628-629 (7th Cir.2001). And so, on the same record, courts can arrive at different results, and both can still be appropriate exercises of discretion. *McCleskey v. Kemp,* 481 U.S. 279, 289-290 (1987); *Mejia v. Cook County, Ill.,* 650 F.3d 631, 635 (7th Cir.2011).

The totality of the circumstances here counsel that discretion be exercised in favor of

allowing the Investors to file their answer and deciding what's left of this case on the merits. That, after all, is the general preference in the federal system, where "default judgments are disfavored and cases are to be decided on their merits whenever reasonably possible." Westchester Fire Insurance Co., 585 F3d 1183, 1189 (9th Cir. 2009). *See, Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago and Northwest Indiana*, – F.3d –, –, 2015 WL 2151851, 5 (7th Cir. 2015);*In re Petition of Boehringer Ingelheim Pharmaceuticals, Inc., and Boehringer Ingelheim International GmbH, in Pradaxa (Dabigatran Etexilate) Products Liability Litigation*, 745 F.3d 216, 225 (7th Cir. 2014). The "'Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits.'" *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 514 (2002).

## CONCLUSION

The Trustees have not been able to point to a single matter of substance that they would have dealt with differently had the Investors' answers, and affirmative defenses been filed earlier. Indeed, the evidence is quite compelling that the Trustees were unaware of the oversight in answering, as evidenced by the fact that the motion for default judgment on the counterclaims was sought as a sanction for purported discovery violations made and no mention of the absence of an answer. [Dkt. #152]. *See King v. Cooke*, 26 F.3d 720 (7th Cir. 1994). Basing the motion on the absence of an answer would have been an obviously more compelling than seeking a default judgment as a sanction. That the Trustees did not follow that course speaks volumes over their lack of knowledge regarding the non-filing. That some additional discovery may be entailed is not a compelling reason to deny the Investors' motion. No trial date has been se, and there is no date for the pretrial order or even for dispositive motions. The Counter-Defendants' Motion for Leave to File Answer,

12

Defenses, and Affirmative Defenses to Defendants' Counterclaims *Instanter* [Dkt. #195] is GRANTED and the Investors may file their *instanter*.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 5/18/15